## Case No. 10,416.

### The OCEAN WAVE.

[3 Biss. 317; 4 Chi. Leg. News, 486; 6 Alb. Law J. 407.] 1

District Court, E. D. Wisconsin. Aug., 1872.

#### DUTY OF MASTER AFTER STRANDING.

1. After a vessel is stranded there is still an obligation upon the master to take all possible care of the cargo.

2. Where a barge is made leaky by an effort to remove her from a sand bar, it is the first duty of the master to stop the leak, and secure the cargo from the flow of water.

3. A shipper should not be required to prove negligence on the part of a master until evidence is given tending to show that the injury complained of came within an excepted clause in the bill of lading.

4. What constitutes unavoidable dangers of the river.

Libel by the Home Insurance Company of New York and the Merchants' Insurance Company of Chicago against the steamboat Ocean Wave and the barge Bill Fleming, to recover the amounts paid by them on policies of insurance issued to Beaupre & Kelley on a cargo of bulk wheat shipped by them at St. Paul on the barge Bill Fleming, in tow of the steamboat Ocean Wave, to be transported to Prairie du Chien.

N. J. Emmons, for libellant.

J. W. Cary, for respondents.

MILLER, District Judge. The usual exceptions of unavoidable dangers of the river and fire were contained in the bill of lading. It is alleged in the answer of claimants, "that at a point on the Mississippi river, between Nebesha, in the state of Minnesota, and Alma, in the state of Wisconsin, and while passing in the usual channel of the river and proceeding with due caution and care, the barge Bill Fleming struck a bar in the river and stuck fast, and the steamer and the other barge in tow, by their own impetus and the current of the river, were carried against the barge Fleming with great force, and caused the guards of the steamer to break down a fender part of the barge Fleming, tearing away the fastenings of the same below the water line of the barge, and crushing in the side of the barge. And an examination being made then and there, the barge was discovered to have sprung a leak and to make water freely."

The barge was new, well built, staunch and strong. The timber head of the barge was broke in, the bolts that her timber head were bolted with were driven through her side. The timber head was broken in, so that the top bolt of the timber head was driven through the sides, and the second bolt from the top nearly through; and the third bolt

1 [Reported by Josiah H. Bissell, Esq., and here reprinted by permission. 6 Alb. Law J. 407, contains only a partial report.]

driven through the outside plank The timber head is fixed in and fastened to the barge in its construction in this wise: "The bottom of the timber head is bolted to the bilge keelson and top timber, also two screw bolts run through the outside and the top timber, through the side clamps inside and the timber head, being one inch bolts, having a big flat head on the outside, fastened on the inside with a nut and a washer." The effect of the drawing of the bolts in the manner described was to make the barge leak through the bolt holes on to the wheat. [The water would go right into the wheat, except what would run in behind the sheathing, the most of it would go into the wheat.] [2] Water did not show in the pump well until it had wetted the wheat, and ran down through the dunnage boards. The upper bolt was in a line with the water.

The barge ran on the bar at Beef slough in the forenoon of the day, in the month of May, and was taken off about six o'clock that evening, and towed down to Alma, about three miles, that night, when it was discovered that she had water in her, and pumping then commenced.

The usual way of getting barges off was not successful—that is to have lines from the barge to the boat, the boat backing and going ahead, sometimes one way and sometimes the other way. The engineer of the steamboat testified, that they pulled at the barge until the guards were torn off the steamboat. The captain then ordered us to drive her off the bar by running the boat against her and butting her off. In doing so we drove in one of the timber heads of the barge. The barge was got off in that way and landed at Alma. One hundred and fifty pounds of steam to the square inch was used in butting the barge off. We made a line fast to the barge and steamboat, giving the line twenty feet slack. The boat drifted back that twenty feet with the current, and then came ahead with both engines strong, and butted the barge off. The barge was struck right against her timber head. The pilot of the steamboat corroborated in substance the testimony of the engineer. The captain saw the injury to the barge, and he had two carpenters on board. The leak could have been discovered by going into the hatch, or by looking into either of the scuttle hatches, or by use of the pumps, which would take water at two inches depth.

The answer does not state truthfully the cause of the injury to the barge. Not one particle of evidence supports the answer in this respect.

In my opinion, the answer does not bring the respondent within the exception of unavoidable dangers of the river. The answer merely alleges that while passing in the usual channel of the river, and proceeding with due care and caution, the barge Fleming struck a bar in the river and stuck fast. It is not alleged that the bar was unknown, or that it could not have been avoided. The barge struck a bar, in broad daylight, which was well known to the pilots. The case of Transportation Co. v. Downer, 11 Wall. [78 U. S.] 129, is referred to as ruling this case. If the record of that trial had contained the facts proven by the master of the steamer, in which the plaintiff's coffee was stored, that he, the master, had not entered the harbor at Chicago for two years, and that he refused a tug, with the additional fact that the channel of the harbor was a shifting channel by means of sand, it is not probable that the supreme court would have decided that that harbor was a peril of navigation. The master was a comparative stranger to that harbor, and was incompetent to navigate his vessel in. With proper knowledge and due care, with the aid of a tug, he could have avoided the accident. With these facts proven, the circuit court, in my opinion, could not consider the defendant as within the exception. The master must be competent to the discharge of his duties before the exception should be allowed. If that case, as reported, is adhered to as law, all that the owners of steamboats are required, in order to bring themselves within the exception, is to show that they encountered shallow water and stuck. Before a shipper should be put to prove negligence on the part of the carrier, the carrier should furnish evidence tending to show that the accident was unavoidable. The allegation in the answer that they were passing down the usual channel and proceeding with due caution and care, may be seen in substance in almost every answer. The boat may have been in the channel, but the barge not. The respondent must show that the boat and barge were in the usual channel, and that the injury was caused by an excepted cause.

The holes knocked in the barge should have been sought for and plugged without delay. The upper hole was visible, and the lower holes might have been discovered by feeling down in the water, and by going into the hatches the leakage no doubt would have been detected. The flowage of water on the wheat was not discovered for several hours after the barge had been towed to Alma. It was the first duty of the captain to use all means in his power for the security of the cargo. For his neglect there is no possible excuse. He is clearly in fault for the damage to the wheat, and a decree must be made for libellants.

[NOTE. Pursuant to an order of reference, the commissioner reported the several amounts paid by the libellants of the loss with interest, to which the claimants filed exceptions, which were overruled. Case No. 10,417. An appeal was then taken to the circuit court, where the decree of this court was affirmed. Case unreported.]

NOTE. That after the stranding of a vessel the master is bound to take all possible care of

---

the cargo, consult The Portsmouth [Case No. 11,295].

That striking on a concealed snag, in the ordinary channel, and not known to pilots, brings the carrier within the exceptions in the bill of lading of "unavoidable dangers of the river." The Keokuk [Case No. 7,721].

The carrier in order to relieve himself from liability for loss or damage must bring himself within the peril excepted in his bill of lading; and the burden of proof is upon him. Clark v. Bonnell, 12 How. [53 U. S.] 272; Chouteaux v. Leech, 18 Pa. St. 233; King v. Shepherd [Case No. 7,804]; Abb. Shipp. 478; 1 Smith, Lead. Cas. 315 et seq.; Fland. Shipp. § 257; Pars. Mar. Law, 348; Chit. Carr. 242.

As to what constitutes unavoidable dangers of navigation, consult same authorities, and The Northern Belle [Case No. 10,319], and authorities there cited.

For the right of a re-insurer who has paid the original insurer, to recover of the carrier, consult The Ocean Wave [Case No. 10,417].